IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIBER GLOBAL, LLC
                    *Plaintiff,*

        v.

SAP AMERICA, INC.,
                    *Defendant.*

CIVIL ACTION
NO. 19-5884

PAPPERT, J.                                        **March 25, 2021**

## MEMORANDUM

Plaintiff Ciber Global, LLC (f/k/a HTC Global Ventures, LLC) ("Ciber") and

Defendant SAP America, Inc. ("SAP") filed cross motions for summary judgment.  Ciber

asserts claims against SAP for breach of contract, account stated and unjust

enrichment, seeking to recover funds SAP allegedly owed non-parties CIBER, Inc.,

CIBER International, LLC, and CIBER Consulting. Incorporated ("Debtors") when

Ciber purchased certain assets in Debtors' bankruptcy proceeding.  SAP contends

Ciber's breach of contract and unjust enrichment claims fail as a matter of law and that

it has a valid setoff defense barring Ciber's right to recover any amounts SAP owed to

Debtors.  The Court grants and denies each motion in part.

I

Debtors were SAP's customers, licensing its software, purchasing its cloud and

information technology professional services and reselling certain SAP software and

services.  (SAP Statement of Material Facts, ECF 33-2, ¶ 2.)  Debtors owed SAP

approximately $9,370,624.13 for its services when they commenced a voluntary

Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the

1

District of Delaware on April 9, 2017.  (*Id.* ¶ 22; Ciber Statement of Undisputed Material Facts, ECF 32-2, ¶ 4.)  Debtors' bankruptcy petition identified SAP as their largest unsecured creditor.  (ECF 33-2, ¶ 7.)

The relationship between SAP and Debtors also ran in the other direction, with SAP as Debtors' customer under a separate Consulting Services Agreement governed by Pennsylvania law.  (*Id.* ¶ 3; *see also* ECF 32-2, ¶¶ 4, 6.)  Before filing their bankruptcy petition, Debtors issued invoices to SAP for $606,462.50 and, after the bankruptcy filing, they billed SAP an additional $375,535.  (ECF 33-2, ¶ 36; *see also* Ciber's Response to SAP Statement of Material Facts, ECF 36-1, ¶ 36.)  In total, Debtors charged SAP $981,997.50.  (ECF 32-2, ¶ 8.)  SAP acknowledges it has not paid $973,197.50 of that amount.  (*Id.* ¶ 10.)

On April 10, 2017, Debtors filed a motion seeking to sell substantially all their assets in the Chapter 11 proceeding.  (ECF 33-2, ¶ 8.)  On May 12, 2017, they filed a proposed order that would approve the motion and the sale of their assets to a successful auction bidder.  (*Id.* ¶ 10.)  Paragraph 20 of the initial proposed order stated:

> [f]or purposes of clarification, no provision of this Sale Order or the Asset Purchase Agreement shall authorize the Debtors to:  (a) sell, transfer or assign to the Purchaser any software or proprietary information ("Software" licensed to any Debtor by SAP America, Inc. or its affiliates ("SAP") in violation of applicable law (within the meaning of 11 U.S.C. § 365(c)(1)(A)) that prohibits the sale, transfer or assignment thereof to the Purchaser without the consent of SAP; or (b) use the Software or any Software-related services provided by SAP for the benefit of the Purchaser or any other third party, in each case, to the extent prohibited by the agreements governing such Software or Software-related services. Notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, *SAP shall retain the right to assert for defensive purposes only all defenses, including setoff or recoupment, against any Accounts Receivable that may be owed by SAP to any Debtor.*

(*Id.* ¶ 11 (emphasis added).)

Ciber was the successful bidder at the bankruptcy auction and entered into an Asset Purchase Agreement with Debtors on May 17, 2017.  (ECF 32-2 ¶ 13; ECF 33-2 ¶ 12.)  In paragraph 1.1 of the Asset Purchase Agreement, Debtors agreed

> to sell, transfer, assign, convey and deliver to [Ciber], and [Ciber] shall purchase, acquire, assume and accept from [Debtors] all of [Debtors'] rights, title and interest in, to and under, as of the Closing (in each case, free and clear of any and all Encumbrances or Claims, other than Permitted Encumbrances), all assets, properties, and rights related to or used in the Business, other than the Excluded Assets, whether tangible and intangible, real, personal and mixed, whether now owned or hereafter acquired by Seller of its Subsidiaries, whether or not specifically referred to herein or in any instrument of conveyance delivered pursuant hereto, including the following, but in each case excluding the Excluded Assets (collectively the "Purchased Assets") . . . .

(ECF 32-2, ¶ 14.)  Paragraph 1.1(c) includes within the Purchased Assets "all trade and non-trade accounts receivable . . . of Seller related to the Business" (the "Accounts Receivable").  (Asset Purchase Agreement (Excerpts), ECF 32-9, ¶ 1.1(c).)  Although the Purchased Assets include specific "Assigned Contracts," the Asset Purchase Agreement does not identify any contract between any of Debtors and SAP.  (*Id.* ¶ 1.1(b) and Schedule 1.1(b).)

Ciber also agreed it would assume only certain "Assumed Liabilities" from Debtors and would not assume other "Excluded Liabilities."  (*Id.* ¶ 1.4.)  Excluded Liabilities include "all Liabilities arising under the accounts payable that are owed to the parties set forth on Schedule 1.4(a)."  (*Id.* ¶ 1.4.)  Schedule 1.4(a) lists a $3,343,128 liability to SAP America, Inc.  (*Id.* Schedule 1.4(a).)  Excluded liabilities also include

> all Liabilities related to Claims, commercial disputes, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, authorities, or otherwise) involving, against, or affecting any Purchased Asset, the Business, Seller . . . or assets or properties of Seller, whether commenced, filed, initiated, or threatened before or after the Closing and whether related to facts, events, or

circumstances arising or occurring before or after the Closing, including the
matters set forth on Schedule 1.4(q)[.]

(*Id.* ¶ 1.4(q).)  The "Excluded Litigation and Other Disputes" listed in Schedule 1.4(q)

includes "[a]ny pending or threatened dispute with or claims made by SAP."  (*Id.*,

Schedule 1.4(q), ¶ 12.)  "Notwithstanding any provision in [the Asset Purchase]

Agreement to the contrary," Ciber also agreed it would not assume

> any other Liabilities of [Debtors] of whatever nature (whether arising prior
> to, at the time of, or subsequent to Closing), whether absolute, accrued,
> contingent or otherwise, whether due or to become due and whether or not
> known or unknown or currently existing or hereafter arising or matured or
> unmatured, direct or indirect . . . .

(*Id.* ¶ 1.4.)

On May 18, 2017, Debtors filed a revised proposed sale order showing certain

changes to the language of the initial proposed sale order but leaving unchanged

paragraph 20's final sentence which permitted SAP to retain the right to assert all

defenses – including setoff – against any Accounts Receivable owed by SAP to any

debtor, "for defensive purposes only."  (ECF 33-2 ¶¶ 12-13.)  The following day, the

Bankruptcy Court approved Debtors' sale of certain assets to Ciber.  (*Id.* ¶ 22.)

Paragraph S of the Bankruptcy Court's Sale Order states that,

> Pursuant to the terms and conditions of the Asset Purchase Agreement and
> this Sale Order, the Debtors may sell the Purchased Assets free and clear
> of all liens, interest, liabilities, obligations, Excluded Liabilities, claims,
> demands, guarantees, suits, defenses, credits, allowances, options, rights,
> restrictions, limitations, contractual commitments, causes of action, choses
> in action, charges, rights of first refusal, rights to set off, recoupment,
> rebate, chargeback, credit or return, Encumbrances . . . and similar
> restrictions (other than . . . the Assumed Liabilities) of any kind or nature
> whether known or unknown, legal or equitable, matured or unmatured,
> contingent or non-contingent, liquidated or unliquidated, asserted or
> unasserted, whether arising prior to or subsequent to the commencement
> of the Debtors' chapter 11 cases, whether imposed by agreement,
> understanding, law, equity or otherwise (collectively the "Interests"),

including, without limitation, (a) those interests that purport to give to any party a right or option to effect a setoff against . . . the Debtors' interests in the Purchased Assets, or any similar rights, if any, . . . [,and] (c) those Interests that are Excluded Liabilities as set forth in the Asset Purchase Agreement . . . .

(Sale Order, ECF 32-10, ¶ S; *see also* ECF 32-2, ¶ 23.)  The Sale Order also states that Ciber did not assume "any liability or obligation of any of the Debtors/and or their estates, other than the Assumed Liabilities, with respect to the Purchased Assets . . . ." (ECF 32-10, ¶ 21.)  Paragraph HH of the Sale Order provides that the Order's terms "shall not modify the terms of the Asset Purchase Agreement."  (*Id.* ¶ HH.)

Debtors' transfer of Purchased Assets to Ciber pursuant to the Sale Order and the Asset Purchase Agreement purported to vest Ciber "with all legal, equitable, and beneficial right, title and interest of the Debtors to the Purchased Assets free and clear of all Interests of any kind or nature whatsoever . . . ."  (*Id.* ¶ GG.)  However, consistent with the initial proposed sale order, the executed Sale Order also included the final sentence of Paragraph 20 which purported to retain SAP's right to assert setoff "for defensive purposes only," "[n]otwithstanding anything in th[e] Sale Order or the Asset Purchase Agreement to the contrary . . . ."  (*Id.* ¶ 20; *see also* ECF 32-2, ¶ 27; ECF 33-2, ¶ 16.)  The sale closed on June 8, 2017 (ECF 32-2, ¶ 29.)

On July 13, 2017, SAP filed a Proof of Claim in the Bankruptcy Court for $10,795,235.14 against CIBER, Inc. relating to a Software License Agreement between them.  (*Id.* ¶ 30.)  On August 28, 2017, Debtors filed an amended Schedule E/F for CIBER, Inc. scheduling SAP as having a "disputed non-priority unsecured claim in the amount of $3,343,127.96."  (*Id.* ¶ 31.)

On September 11, 2017, Ciber emailed SAP, asking that it pay the amounts

5

owed under the Accounts Receivable. (*Id.* ¶ 39.) Absent a response, Ciber emailed SAP again on October 11, 2017. (Oct. 11, 2017 Email from Jennifer Coronado to Mailen Corti, ECF 32-14 at 1.) SAP responded that day and told Ciber that the account in question had "a payment block requested by Accounts Receivable as vendor Ciber owes SAP money." (ECF 32-2, ¶ 40; Oct. 11, 2017 Email from Mailen Corti to Jennifer Tafoya, ECF 32-14 at 1.) SAP's email did not recognize any distinction between Ciber and bankrupt CIBER, Inc. and told Ciber to "contact Cash Collections . . . ." (*Id.*)

On December 20, 2017, SAP entered into a claims settlement stipulation (the "Stipulation") with Debtors, agreeing SAP's claim would be "granted as an allowed unsecured non-priority claim (Class 3 General Unsecured Claims of the Plan) against [CIBER, Inc.] in the amount of $5,717,000.00." (ECF 32-2, ¶ 34 (alteration in original).) Per the Stipulation, SAP was "deemed to have made the Class 3 Cash-Out Election in Item 4 of its duly authorized Class 3 ballot." (*Id.*) The Class 3 Cash-Out Election was a Debtors' Plan option that allowed unsecured creditors to receive thirty-five percent of their claims as a distribution on the Plan's effective date instead of distributions over time from a liquidating trust. (*Id.* ¶¶ 25-26.) SAP received $2,000,000 for its claim. (*Id.* ¶ 29.)

On January 29, 2018, Ciber reasserted its request for SAP's payment of the Accounts Receivable. (*Id.* ¶ 41.) Ciber's General Counsel explained that Ciber had purchased "the receivable owed by SAP to Ciber, Inc." pursuant to Section 363 of the Bankruptcy Code and had "understood payment was in process, but then learned from SAP A/P that the matter was with the legal department." (Jan. 29, 2018 Email from Paul Kemp to John Hickey, ECF 32-15, at 1.) On February 12, 2018, counsel for SAP

responded that "the accounts receivable were purchased subject to SAP's defenses, including SAP's right of setoff which were specifically preserved in the bankruptcy court's order . . . ." (Feb. 12, 2018 Email from Donald Ludman to Paul Kemp, ECF 32-16, at 1.)  SAP asserted that it "may set off the remaining $3.7 million against the purchased receivables."  (*Id.*; *see also* ECF 34-2, ¶ 42; ECF 33-2, ¶ 32.)  On June 12, 2019, Ciber sent SAP's counsel a letter demanding SAP pay $981,997.50 on account of the purchased accounts receivable.  (ECF 33-2, ¶ 33.)  Ciber commenced this action on December 13, 2019.  (ECF 1.)

## II

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The rule is no different where there are cross-motions for summary judgment."  *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).  The filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]"  *Id.* Each movant bears the initial responsibility for informing the Court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004), holding modified by *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

A dispute is genuine if the evidence[1] is such that a reasonable factfinder could

---

[1]  The Court may rely only on admissible evidence.  *See* Fed. R. Civ. P. 56(c); *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 94 (3d Cir. 1999).

return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the suit's outcome under the governing law. *Id.* at 248. A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

Where a defendant moves for summary judgment based on an affirmative defense, it would bear the burden of proof at trial and must "show that it has produced enough evidence to support the findings of fact necessary to win" on summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007); *see also Hena v. Vandegrift*, No. 18-762, 2020 WL 1158640, at *30 (W.D. Pa. Mar. 10, 2020) ("To be entitled to summary judgment on an affirmative defense, the defendant must show that based upon the undisputed facts of evidence, a reasonable jury could find only in its favor with respect to the affirmative defense.") (citation omitted).

In the context of cross-motions, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party with respect to each motion. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004); *see also Lawrence*, 527 F.3d at 310. But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may the Court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

III

A

Ciber contends its "purchase of the Accounts Receivable entitle[s] it to sue SAP

for breach of contract." (Ciber Opp'n Mem., ECF 36 at 17.)  It asserts it has "the right to pursue the same remedies that Debtors may have sought under their contract with SAP for breach" because it acquired Debtors' "rights, title, and interest in the Accounts Receivable" pursuant to the May 19, 2017 Asset Purchase Agreement.[2]  (Ciber Summary Judgment Mem., ECF 32-1 at 7.)  To prevail on its claim, Ciber must establish (1) the existence of a contract, (2) breach of a contractually imposed duty and (3) resulting damages.  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003).

Generally, to bring a claim for breach of contract, the plaintiff must be a party to the agreement.  *See Viso v. Werner*, 369 A.2d 1185, 1187 (Pa. 1977).  Ciber admits no contract exists between it and SAP.  (Ciber Responses to Requests for Admission, ECF 33-10, ¶ 2.)  However, parties may acquire rights and duties under a contract "both through the initial formation of the agreement, as well as through later actions such as collateral assignment."  *PA Realty Abstract Co. of Springfield v. Sevenson Env't Servs., Inc.*, No. 12-4171, 2012 WL 13018278, at *2 (E.D. Pa. Oct. 9, 2012).  Ciber admits Debtors did not assign their contracts with SAP to it as part of the bankruptcy sale.  (ECF 36-1 ¶ 17; *see also* ECF 32-9, ¶ 1.1(b).)  Instead, Debtors assigned their Accounts Receivable to Ciber.  (ECF 32-9, ¶ 1.1(c).)  Ciber argues it can bring a breach of contract claim because it now holds "all of" Debtors' "rights title and interest in" the Accounts Receivable.  (ECF 36 at 18 (citing ECF 32-3, ¶ 13); *see also* ECF 32-9 (Asset Purchase

---

[2]     Although Ciber's Complaint does not specifically identify the contract underlying its breach of contract claim (*see* ECF 1, ¶¶ 21-27), in its summary judgment memorandum of law, Ciber contends "the contract at issue is the Consulting Services Agreement and related [Statements of Work] between SAP and Debtors."  (ECF 32-1 at 7.)  The Consulting Services Agreement is governed by Pennsylvania law (ECF 32-4, ¶ 18) and, for purposes of the current motion, the parties appear to agree that Pennsylvania law governs Ciber's breach of contract claim.  (*See* ECF 32-1 at 7 and ECF 33-1 at 9.)

Agreement), ¶ 1.1.)

Under Pennsylvania law, an assignee has no greater rights than did the assignor. *Horbal v. Moxham Nat. Bank*, 697 A.2d 577, 583 (Pa. 1997) (Castille, J., concurring); *see In re Purman's Estate*, 56 A.2d 86 (Pa. 1948) ("[An assignment is a transfer of property or some other right from one person to another, and unless in some way qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee."). Assignments are "ordinarily . . . construed in accordance with the rules of construction governing contracts and the circumstances surrounding the execution of the assignment document." *Horbal*, 697 A.2d at 583 (citing *U.S. Nat'l Bank v. Campbell*, 47 A.2d 697 (Pa. 1946)).

Had Debtors intended to assign the full benefit of their contracts with SAP to Ciber, they could have done so, but they did not. The Asset Purchase Agreement addresses Debtors' Assigned Contracts separately from their assigned Accounts Receivable. (ECF 32-9, ¶ 1.1(b) (Assigned Contracts); *id.* ¶ 1.1(c) (Accounts Receivable.) Debtors assigned to Ciber only the Accounts Receivable, i.e., something less than the entirety of the underlying contracts. Ciber has not provided any authority supporting its argument that the assignment of something other than all of the rights in a contract permits it to stand in Debtors' shoes for purposes of a breach of contract claim against SAP. (*See* ECF 32-1 at 7; ECF 36 at 18.) Instead, in *Smith v. Cumberland Group*, which Ciber cites, the Superior Court considered whether an "arbitration clause contained in a construction contract between an owner and a general contractor who then assigned the contract to another contractor is invoked in a contract dispute between the owner and the assignee-contractor." 687 A.2d 1167, 1169 (Pa. Super. Ct.

1997).  The Court concluded the arbitration clause was assignable as part of "the contract as a whole" because "[w]here an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his rights."  *Id.* at 1172; *see Cecil Twp. Mun. Auth. v. N. Am. Specialty Sur. Co.*, 836 F. Supp. 2d 367, 385 (W.D. Pa. 2011) ("'Ultimately, an assignee stands in the shoes of the assignor.'") (quoting *Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 620 (Pa. 2005)).  Here, unlike in *Smith* and *Cecil Township*, other authority Ciber relies on, Ciber has not shown Debtors assigned it *all* the rights in their contracts with SAP.  *Cf. Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001) ("[A]bsent a provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held and not in an expansion of those rights to include those held by the assignee.").

SAP argues the Asset Purchase Agreement's treatment of contracts and accounts receivable is distinct because 11 U.S.C. § 365(b)(1) would have required a cure of all defaults under the contracts, "including a payment default," before contracts could be assigned.  (SAP Opp'n Mem., ECF 37 at 5.)  "Section 365 of the Bankruptcy Code authorizes the trustee to assume or reject executory contracts, enabling 'the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not.'"  *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001) (quoting *L.R.S.C. Co. v. Rickel Home Centers*, 209 F.3d 291, 298 (3d Cir. 2000)); *see also In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169 (7th Cir. 1996) ("[T]he language of § 365(b)(1) is unequivocal.  A party to an executory contract must be paid all amounts due him under the contract before the contract may be

assumed.")  Indeed, the Asset Purchase Agreement assigns contracts to Ciber only "to the extent they may be assumed and assigned pursuant to Sections 363 and 365 of the Bankruptcy Code . . . ."  (ECF 32-9, ¶ 1.1(b).)  Section "365 serves to balance state-law contractual rights of creditors – to receive the benefit of their bargain – with the equitable rights of a debtor under bankruptcy law – to have an opportunity to reorganize."  *In re Seven Hills, Inc.*, 403 B.R. 327, 334 (Bankr. D.N.J. 2009).  Debtors did not resolve their unpaid debts to SAP before the bankruptcy auction.  Consistent with Section 365, Debtors accordingly transferred only SAP's Accounts Receivable via the Asset Purchase Agreement.

Standing in Debtors' shoes, Ciber has assumed their rights to the Accounts Receivable, but it has not shown that it has assumed the right to pursue a breach of contract claim against SAP.  Although Ciber may seek to recover the Accounts Receivable, it may not do so in the context of a breach of contract claim and SAP is entitled to summary judgment on Count I.

B

1

In Count II, Ciber asserts an account stated claim against SAP for $981,997.50 because SAP has not paid "all outstanding amounts due and owing relating to the Accounts Receivable."  (ECF 1, ¶¶ 28-30.)  To prevail, Ciber "must show that a balance was struck 'in such circumstances as to import a promise of payment on the one side and acceptance on the other.'"  *U.S. v. A.S. Kreider Co.*, 313 U.S. 443, 448 (1941) (quoting *R. H. Stearns Co. v. United States*, 291 U.S. 54, 65 (1934)).  SAP contends it has not paid Ciber because Paragraph 20 of the Bankruptcy Sale Order allowed it to

12

retain the right to setoff the amounts Debtors owed to it against Ciber's interest in the Accounts Receivable.  (*See* SAP Summary Judgment Mem., ECF 33-1 at 11-20; ECF 37 at 6-16.)  "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'"  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)).

Paragraph 20 provides that "[n]otwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, SAP shall retain the right to assert for defensive purposes only all defenses, including setoff . . . against any Accounts Receivable that may be owed by SAP to any Debtor."  (ECF 32-10, ¶ 20.)  This specific language controls, notwithstanding more general references to a "free and clear" sale elsewhere in the Sale Order.  *See In re Safety-Kleen Corp.*, 380 B.R. 716, 737 (Bankr. D. Del. 2008) ("Even if there was inconsistency" between provisions of the Sale Order "the more specific language in the Sale Order . . . would control.") (citation omitted).  The terms of the Sale Order preserve SAP's right to assert setoff as a defense against claims made for the Accounts Receivable it owed Debtors at the time of the bankruptcy sale.  However, to exercise this right to setoff in the context of Debtors' Chapter 11 bankruptcy, SAP must also meet the "requirements and limitations set forth in section 553" of the Bankruptcy Code.  *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009).

The Bankruptcy Code preserves a creditor's[3] right "to offset a mutual debt"

---

[3]    Because the question of mutuality is dispositive of SAP's setoff defense, the Court does not address Ciber's argument that SAP is not a creditor under Section 553(a) because the debt SAP seeks to offset was satisfied by the December 17, 2020 Stipulation between SAP and Debtors. (ECF 36 at 3-6.)

between it and a debtor "that arose before the commencement of the case." 11 U.S.C. § 553(a). Mutuality is "a distinct statutory requirement under § 553." *In re Orexigen Therapeutics, Inc.*, --- F.3d ----, No. 20-1136, 2021 WL 1046485, at *3 (3d Cir. Mar. 19, 2021). The requirement is "strictly construed against the party seeking setoff." *SemCrude*, 399 B.R. at 396 (citation omitted). Here, it is dispositive of SAP's ability to assert the defense against Ciber. The relevant question is whether there is mutuality between Ciber's assigned right to collect on the Accounts Receivable SAP owed to Debtors and any debt to SAP not settled by the Stipulation. There is not.

The term "mutual debt," is "not defined by the Code." *Id.* But "[i]n articulating exactly who must owe whom a debt to effect a setoff under § 553(a), Congress used a greater detail of precision than is seen in many other parts of the Code." *Id.*, 399 B.R., at 397. In *Orexigen*, the Third Circuit held that "Congress intended for mutuality to mean only debts owing between two parties, specifically those owing from a creditor directly to the debtor and in turn, owing from the debtor directly to that creditor." 2021 WL 1046485, at *4.

Any outstanding balance due SAP is due only on the contracts for services SAP provided Debtors. This obligation was not assigned to Ciber. Indeed, in the Asset Purchase Agreement, Ciber and Debtors agreed that Ciber would not assume Debtors' outstanding debt to SAP (ECF 32-9, ¶ 1.4) and that Ciber would not assume any liabilities related to "any pending or threatened dispute with or claims made by SAP." (ECF 32-9, ¶ 1.4(q); *id.* Schedule 1.4(q), ¶ 12.) Debtors' assignment to Ciber of the Accounts Receivable did not expand SAP's rights to include the right to setoff obligations owed it by Debtors against the obligations SAP still owes pursuant to the

Accounts Receivable.  Allowing SAP to setoff its obligation to Ciber against SAP's claim
against Debtors would result in the same "absurdity" that barred a finding of mutuality
in *In re IT Group, Inc.*:  A (SAP) would not have to pay B (Ciber), because C (Debtors)
did not fully satisfy their obligations to SAP.  350 B.R. 166, 174 (Bankr. D. Del. 2006).

Although this is an outcome SAP no doubt tried to avoid by negotiating the
language in Paragraph 20 of the Sale Order, SAP cannot use that provision to receive a
benefit that was unavailable to Debtors' other creditors.  "[C]ontractual arrangements
cannot transform a triangular set of obligations into bilateral mutuality."  *Orexigen,*
2021 WL 1046485, at *5; *see also In re Am. Home Mortg., Holdings, Inc.*, 501 B.R. 44, 57
(Bankr. D. Del. 2013) (holding Section 553 requires debts to "be mutual to be setoff and
parties cannot contract around this requirement . . . ").

> One of the primary goals – if not the primary goal – of the Code is to ensure
> that similarly situated creditors are treated fairly and enjoy an equality of
> distribution from a debtor absent a compelling reason to depart from this
> principle.    By allowing parties to contract around the mutuality
> requirement of section 553, one creditor or a handful of creditors could
> unfairly obtain payment from a debtor at the expense of the debtor's other
> creditors, thereby upsetting the priority scheme of the Code and reducing
> the amount available for distribution to all creditors . . . .  Such a result is
> clearly contrary both to the text of the Code and to the principle of equitable
> distribution that lies at the heart of the Code.

*SemCrude*, 399 B.R. at 399 (citations omitted); *see also Orexigen*, 2021 WL 1046485, at
*5.  Although "[p]arties may freely contract for triangular setoff rights," they may not
do so "in derogation of these mandates of the Bankruptcy Code."  *Orexigen*, 2021 WL
1046485, at *5 (citation omitted).  SAP cannot assert its setoff defense against Ciber's
account stated claim.

2

SAP contends other affirmative defenses, including equitable estoppel, waiver

15

and laches also bar Ciber's claim for the Accounts Receivable.  (*See* ECF 37 at 19-21.)
SAP argues Ciber should be estopped from asserting its claims because of its "failure to
take any preventative or corrective opportunities in light of SAP's unequivocal intent
regarding setoff."  (*Id.* at 19.)  SAP also notes that after Ciber sought to collect payment
from it in 2018, it waited sixteen months before again demanding payment on the
Accounts Receivable in June 2019.  (*Id.* at 20.)  It contends the "extraordinary delay"
led it "to believe Ciber recognized [SAP's] rights in the purchased accounts receivable."
(*Id.*)

To begin, the statute of limitations for an account stated claim is four years.  *See*
*Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 465 (E.D. Pa. 2008) (applying
Pennsylvania's four-year statute of limitations for "contracts implied in law" to an
"account stated" claim).  "Where the plaintiff has filed suit within the statute of
limitations, the burden is on the defendant asserting the equitable defense of laches to
show that he was prejudiced thereby."  *Price v. Levers*, 475 F. Supp. 937, 942 (W.D. Pa.
1979), aff'd, 620 F.2d 289 (3d Cir. 1980); *see also Univ. of Pittsburgh v. Champion*
*Products, Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982) (explaining the defense of laches has
two elements:  (1) inexcusable or unreasonable delay in filing suit, and (2) prejudice to
the defendant resulting from the delay).  SAP has not shown that Ciber neglected to
pursue its Account Stated claim for an unreasonable length of time or that it has been
prejudiced by any delay.

SAP's waiver and estoppel defenses also fall short.  Under Pennsylvania law,
equitable estoppel consists of three elements:  "(1) a representation of fact was made;
(2) upon which the opposing party had the right to rely; and (3) the denial of the

represented fact by the party making the representation would result in injury to the relying party." *In re RFE Industries, Inc.*, 283 F.3d 159, 164 (3d Cir. 2002). Waiver "is the act of *intentionally* relinquishing or abandoning some known right, claim or privilege." *Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962) (emphasis in original). "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Id.* (citation omitted). Although waiver may be express or implied, *id.*, in Pennsylvania, implied waiver "applies only to situations involving circumstances equivalent to an estoppel" and to prevail on the defense, SAP must show that it "was misled and prejudiced thereby." *E. Roofing Sys., Inc. v. Simon Prop. Grp., Inc.*, No. 14-717, 2016 WL 4077266, at *5 (M.D. Pa. Aug. 1, 2016).

SAP argues Ciber's waiver can be "implied" from its failure to object to Paragraph 20 and from its failure to take "any affirmative action in order to insure SAP could not assert its right to setoff the account receivable by the amounts owed by [Debtors]." (ECF 37 at 20.) Notwithstanding SAP's "unequivocal intent regarding setoff" (*id.* at 19), it cannot rest on Ciber's failure to object to Paragraph 20 of the Sale Order, as the language in Paragraph 20 does not preserve SAP's setoff defense in the context of Debtors' bankruptcy.

SAP has not otherwise shown Ciber waived or should be equitably estopped from asserting its right to collect on the Accounts Receivable. There were gaps between Ciber's attempts to collect on the Accounts Receivable in September 2017 (ECF 32-2, ¶ 39), January 2018 (*id.* ¶ 41) and June 2019. (ECF 33-2, ¶ 33.) But SAP declined Ciber's first collection attempt by responding that there was a "payment block" on the

account.  (ECF 32-2, ¶ 40.)  When Ciber attempted to collect on the Accounts Receivable
for the second time, SAP's counsel responded that Paragraph 20's setoff language
prevented payment.  (ECF-16, at 1.)  In the absence of any other evidence, Ciber's
"delayed" collection efforts are not enough to show that Ciber somehow misled SAP into
believing it would forego the Accounts Receivable or that it ever promised to drop its
pursuit of the claim.

The Court enters judgment in Ciber's favor on Count II in the amount of
$981,997.50.[4]  Because Ciber prevails on its claim for account stated, the Court need
not consider its unjust enrichment claim, pled in the alternative in Count III of its
Complaint.

C

Finally, Ciber seeks an award of costs pursuant to Federal Rule of Civil
Procedure 54(d)(1) "if it prevails on its motion for summary judgment."[5]  (ECF 36 at
20.)  The rule provides in pertinent part that, "[u]nless a federal statute, these rules, or
a court order provides otherwise, costs – other than attorney's fees – should be allowed
to the prevailing party."  Fed. R. Civ. P. 54(d)(1).  Although each party's cross-motion
for summary judgment is granted in part and denied in part, Ciber is the prevailing
party for purposes of Rule 54(d)(1) because it can recover the Accounts Receivable
pursuant to its Account Stated claim.  *See Tyler v. O'Neill*, 112 F. App'x 158, 161 (3d
Cir. 2004) ("[S]ignificant to the prevailing party inquiry is whether the resolution of the
dispute materially altered the legal relationship between the parties.") (citing *Truesdell*

---

[4]      SAP acknowledges it has not paid any amounts due under the Accounts Receivable and, for purposes of
summary judgment, does not contest that Debtors invoiced it for a total of $981,997.50.  (ECF 38, ¶¶ 8-9.)

[5]      Ciber states that it no longer seeks attorneys' fees.  (ECF 36 at 20.)

*v. Phila. Hous. Auth.*, 290 F.3d 159, 163–64 (3d Cir. 2002)).

     An appropriate Order follows.

                       BY THE COURT:

                        ***/s/ Gerald J. Pappert***
                       GERALD J. PAPPERT, J.